**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000003
04-SEP-2018
10:19 AM**

NO. CAAP-17-0000003

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF EG

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 14-00002)

SUMMARY DISPOSITION ORDER
(By: Ginoza, C.J., and Leonard and Reifurth, JJ.)

Appellant Father appeals from the Order Terminating Parental Rights, filed on December 23, 2016 in the Family Court of the First Circuit ("Family Court"),[1] which terminated Father's parental rights to his child, EG, who was born in 2013.[2]

On appeal, Father challenges the Family Court's Findings of Fact ("FOF") 101, 105, 106, 107, 112, 117, 118, 119, 131, 132, 134, 135, 136, 138, 141, 146, and 149 and Conclusions of Law ("COL") 6, 9, 10, and 13. Specifically, Father argues that FOFs 101[3], 138[4], and 149[5] are erroneous because (i) there

---

[1]    The Honorable Jennifer L. Ching presided.

[2]    Father's wife, EG's mother ("Mother"), stipulated to termination of her parental rights as to EG during the trial on Petitioner-Appellee State of Hawaiʻi, Department of Human Services' motion to terminate parental rights. Mother does not appeal from the order. Father and Mother are collectively referred to as "Parents" herein.

[3]    FOF 101 states that "Father lacks insight into his mental health problems which negatively impacts upon his ability to provide a safe family
(continued...)

was no testimony by a mental health expert that Father lacked insight into his mental health problems, (ii) the Family Court improperly sustained an objection when a social worker was asked which competing mental health diagnoses for Father it believed justified the Motion to Terminate Parental Rights, and (iii) there was no witness to challenge the credible testimony of Father's expert witness, Dr. Winter Hamada, regarding Father's psychological evaluation, projected clinical discharge of six months, and opinion that Father's mental health status did not warrant concern about his parenting ability of a child.

Father also appears to argue that FOFs 105[6], 106[7],

---

[3] (...continued)
home for the Child."

[4]     FOF 138 states:

> Ms. Tsutsui testified, and the Court finds, that Father lacks insight into his mental health problems[.] Father never acknowledged any problem and was not open to engaging in any mental health services until after the Motion to TPR was filed, Father was very focused on getting his schizophrenia diagnosis removed, and even at the time of her testimony, Father was denying any mental health problems. This was of concern to Ms. Tsutsui because if Father does not have insight into his mental health needs and the importance of engaging with a therapist, then he cannot care for himself, he cannot care for the Child, he lacks insight into the Child's needs, and cannot safely care for the Child.

[5]     FOF 149 states that "Dr. Winter Hamada was qualified as an expert witness, as a clinical psychologist. She was called as a witness by Father. Dr. Hamada testified that her diagnosis of Father is Adjustment Disorder. . . . The Court did not find Dr. Hamada's testimony to be reliable or trustworthy."

[6]     FOF 105 states that "Father was afforded adequate opportunity for reasonable visitation with the Child by DHS."

[7]     FOF 106 states as follows:

> Father has not demonstrated adequate parenting skills during visits with the Child to warrant having unsupervised visits with the Child. Father has a difficult time setting boundaries for the Child. Father continued to need assistance from the visit supervisor in order to keep the Child safe during visits:
>
> a. On one occasion, at a visit at a mall, the Child ran out of parents' sight, and the visit supervisor had to inform parents that the Child had run away.
>
> b. During another visit, Father was with the Child, who was in a stroller; he stopped in the middle of the street, in

(continued...)

107[8/], 117[9/], 131[10/], 132[11/], 134[12/], 135[13/], 136[14/], and 146[15/] are erroneous because (i) Petitioner-Appellee State of Hawaii, Department of Human Services ("DHS"), did not make reasonable efforts to reunify Father and EG; (ii) DHS witnesses were not

---

[7/] (...continued)
the crosswalk, for an extended period of time. The visit supervisor informed Father that this was not safe, and the visit supervisor asked Father to move out of the street.

c. On another occasion, while putting the Child into a vehicle, Father asked the visit supervisor it if was okay to leave the Child in the front seat with no car seat (there was a car seat in the back seat of the car).

[8/] FOF 107 states that "Parents have inadequately supervised the Child during visits, putting the Child in potentially harmful and dangerous situations that required intervention by the visitation supervisor."

[9/] FOF 117 states, "Similarly, under the circumstances presented in this case, the Court specifically finds that Father was given every reasonable opportunity to effect positive changes to provide a safe family home and to reunify with the Child."

[10/] FOF 131 states:

Under the circumstances present in this case, the Court finds, by clear and convincing evidence, the DHS has exerted reasonable and active efforts to reunify the Child with Father by identifying necessary, appropriate, and reasonable services to address the identified safety issues, and by making appropriate and timely referrals for these services.

[11/] FOF 132 states that "[u]nder the circumstances present in this case, the Court finds, by clear and convincing evidence, that the DHS gave Father every reasonable opportunity to succeed in remedying the problems which put the Child at substantial risk of being harmed in the family home and to reunify with the Child."

[12/] FOF 134 states that "[a]ll of the service plans in this case that were offered by DHS, and ordered by the Court, were fair, appropriate, and comprehensive."

[13/] FOF 135 states that "[n]one of the underlying facts and data upon which DHS based its opinion, assessments, and recommendations was shown to be untrustworthy. DHS' investigation and continuing assessment in this case was conducted in an appropriate manner."

[14/] FOF 136 states that "DHS social worker Julie Tsutsui, testifying on behalf of DHS, was a credible witness."

[15/] FOF 146 states:

Brianna Yeomans is a Catholic Charities outreach worker who supervised visits between parents and the Child, [and] provided transportation[] and outreach to the parents. Ms. Yeomans supervised 21 visits. She stated that neither Mother nor Father had met, or made significant progress in attaining, the parenting goals set by Catholic Charities.

credible; and (iii) Catholic Charities outreach worker Brianna Yeomans had not been "instructed" that Father's unsupervised visits with EG were inappropriate.[16/]

Finally, Father challenges FOFs 112[17/] and 141[18/] related to Father's housing situation by claiming that there was not clear and convincing evidence that (i) housing was an ongoing issue, (ii) Father was not presently willing and able to provide a safe family home for EG, and (iii) it was not reasonably foreseeable that he would be willing and able to provide a safe family home for EG within a reasonable period of time, even with the assistance of a service plan as provided in FOFs 118 and 119.[19/]

---

[16/] It is unclear what point Father attempts to make with his reference to that portion of the transcript noting that Yeomans had not been instructed that Father's visits were inappropriate because he makes no argument addressing that testimony. Therefore, we deem the point waived. Haw. R. App. P. 28(b)(7) ("Points not argued may be deemed waived.").

[17/] FOF 112 states:

> Father and Mother moved residences at last [sic] seven (7) times since the Child was born. Parents, at times, lived on farms and in tents with no running water or plumbing. All of the residences since the birth of the Child were deemed to be unsafe for the Child by DHS. Their current apartment floods often and has a low ceiling which requires Mother to bend down, causing her neck pain. The service plans ordered by the Court include that Father obtain and maintain safe and appropriate housing, which Father has not done throughout this case.

[18/] FOF 141 states:

> Ms. Tsutsui testified, and the Court finds, that parents are not able to provide a safe family home for the Child because they have shown a pattern of not being able to sustain stability in areas including mental health, parenting, marital relationship, and housing. These areas of instability would create trauma for the Child, for example, a psychotic episode, constantly moving residences, or seeing the dynamic of parents' interaction with each other. Through the Child's life, the parents have chosen to live in residences not conducive to raising a child, and the history of the case is that Mother and Father have not put the Child's needs first.

[19/] FOFs 118 and 119 state as follows:

> 118. The Court finds, by abundantly clear and convincing evidence, that DHS had demonstrated that Father is not presently willing and able to provide the Child with a safe family home, even with the assistance of a service plan.

> 119. Moreover, the abundantly clear and convincing

(continued...)

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Father's points of error as follows, and affirm the Family Court's order.

In a proceeding to terminate parental rights under the Chile Protective Act, the family court must determine by clear and convincing evidence that: (1) a parent is not presently willing and able to provide a safe family home, even with the assistance of a service plan; (2) it is not reasonably foreseeable that the parent will become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care; and (3) the proposed permanent plan is in the best interests of the child. Haw. Rev. Stat. § 587A-33(a).

"Generally, the family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion." *Fisher v. Fisher*, 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006) (quoting *In re Doe*, 95 Hawaiʻi 183, 189, 20 P.3d 616, 622 (2001)). The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard, while COL's are reviewd de novo, under the "right/wrong" standard. *Id.* (quoting *Doe*, 95 Hawaiʻ at 1i89, 20 P.3d at 622). It is not the province of the appellate courts to assess the credibility of the witnesses or the weight of the evidence. *Id.*

FOFs 101, 138, and 149 are not clearly erroneous. Father contends that FOFs 101 and 138 could not properly be based upon the testimony of Julie Tsutsui, a DHS social worker, because Tsutsui was not qualified to testify as an expert in mental health. Although the court referenced Tsutsui's testimony in support of FOF 138, it did not claim to base its finding

---

19/ (...continued)
evidence shows that it is not reasonably forseeable that Father will become willing and able to provide the Child with a safe family home, even with the assistance of a service plan, within a reasonable period of time not to exceed two years from the Child's date of entry into foster care.

regarding Father's lack of insight on Tsutsui's testimony alone. Rather, FOF 97(1), which is unchallenged by Father, notes that the April 2016 Kapiolani Child Protection Center evaluation concludes that, due to his lack of insight, Father was susceptible to destabilization and his psychosis could re-emerge if he were to experience a high level of stress or relapse.

In addition, no medical or psychological opinion was necessary because Tsutsui's opinion regarding insight does not involve a medical or psychological diagnosis. Essentially, Tsutsui's opinion was that, regardless of Father's mental health diagnosis, it was Father's belief that he had no mental health issues that posed a problem. Thus, Tsutsui's testimony, in conjunction with the various medical evidence presented concerning Father's mental health condition, justified the Family Court sustaining an objection as to which competing mental health diagnoses DHS relied upon to support termination of Father's parental rights because Father did not believe either one of the competing mental health diagnoses.

Father's reliance upon Dr. Hamada's expected clinical discharge in six months is misplaced. In March 2016, Dr. Hamada testified that she expected to clinically discharge Father within six months. However, in December 2016 when Father testified, he stated that he continued to see Dr. Hamada once a week, nearly nine months after Dr. Hamada stated that Father would be clinically discharged within six months. Thus, the Family Court's finding that Dr. Hamada's testimony was not credible was not clearly erroneous. *See Fisher*, 111 Hawaiʻi at 46, 137 P.3d at 360 (it is not the province of the appellate courts to assess the credibility of the witnesses).

FOFs 105, 106, 107, 117, 131, 132, 134, 135, 136, and 146 are not clearly erroneous. Father contends that DHS failed to make reasonable efforts to reunify Father with EG. In support of his claim, Father points to the lack of correspondence by DHS to Dr. Hamada inquiring about Father's progress. Dr. Hamada is a licensed clinical psychologist who was engaged by Father for individual psychotherapy. Dr. Hamada admitted that she had not seen Father with EG. Dr. Hamada was not engaged to assist Father

with reunification beyond providing individual therapy, which she did beginning in September 2015. In addition, Dr. Hamada sent two letters to Tsutui, dated May 2, 2016 and June 30, 2016 that provided a report on Father's treatment.

Father also points to Tsutsui's failure to contact Father's current couples counselor, testimony that unsupervised visits were not inappropriate, and testimony that Father made significant progress in parenting class to support his claim that Father's parenting skills were not inadequate, he had adequate supervised visits with EG, and that Tsutsui was not a credible witness.

In July 2016, Tsutsui testified that she was not able to contact Father's current couples counselor. However, Tsutsui explained that Father was previously terminated from couples counseling in November 2014 for inconsistent attendance and denying that there were any problems, and because it was his third counselor since the beginning of the case. Tsutsui believed that Father started couples counseling sometime in March, he did not attend counseling in June 2016, and their current counselor was on an extended vacation in July 2016; thus, she was not able to contact him.

None of the challenged findings of fact specifically determined that Father's conduct during unsupervised visits was inappropriate. It appears that Father takes issue with the finding that "Father has not demonstrated adequate parenting skills during [supervised] visits with the Child to warrant having unsupervised visits with the Child," and that "Parents have inadequately supervised the Child during [supervised] visits, putting the Child in potentially harmful and dangerous situations that required intervention by the visitation supervisor" contained in FOFs 106 and 107.

In October 2015, Father and Mother had some unsupervised visits with EG to see how they would do, but the unsupervised visits were discontinued due to regressive behavior by EG after the visits. Tsutsui testified that the same parenting class for Father had been previously discontinued in December 2015 after Father was absent five times. Thus, at the

time, Father did not demonstrate adequate parenting skills because he had not completed parenting class. A review report dated July 13, 2016 from Comprehensive Counseling and Support Services rated Father as having made significant progress in parenting classes during the reporting period from March to May 2016. An 'Ohana Time (OT) Observation Form dated June 29, 2016 noted during a visit, while crossing the street to take EG to the bathroom, Father stopped in the middle of the crosswalk to tend to a child in the stroller that he was pushing and had to be warned by the outreach worker that they should cross the street as quickly as possible to minimize the chance of an accident. During that same visit, after placing EG in the front passenger seat of a vehicle and asking the outreach worker, "is she good?", Father had to be told that EG needed to be in a car seat. Thus, Tsutsui testified that she was still concerned about Father's parenting ability due to those incidents during supervised visits. Thus, the Family Court did not err in concluding that Father placed EG in a potentially harmful and dangerous situation during a supervised visit and failed to demonstrate adequate parenting skills even after he was deemed to have made significant progress in parenting class, and that Father did not demonstrate adequate parenting skills during supervised visits to warrant further unsupervised visits.

The Family Court was not clearly erroneous in finding that Tsutsui's testimony was credible. Credibility of witnesses is the province of the trier of fact. *Fisher*, 111 Hawai'i at 46, 137 P.3d at 360. Nothing that Father points to warrants reversal of a finding by the Family Court that Tsutsui's testimony was credible.

Finally, FOFs 112 and 141 are not clearly erroneous. Contrary to Father's claim, there was clear and convincing evidence that there was a pattern of Father not being able to maintain stable housing. When DHS initially filed a Petition for Foster Custody of EG on January 6, 2014, DHS contended that Father was in the process of being evicted and refused to leave the premises for fear that the landlord would lock him out. More than a year later, in a Short Report to Court dated January 29,

2015, DHS reported that Parents did not have housing that could accommodate EG. Parents had moved from Kailua to a farm in Waianae, then to a farm in Kahaluu. In a Safe Family Home Report dated April 13, 2015, DHS reported that Parents had relocated to Kahaluu and resided in a tent on the premises which was very muddy and had mosquitos. Father wanted to work on an organic farm but it did not have housing that could accommodate children. Thus, DHS did not consider the premises suitable for children. Tsutsui testified that Parents moved repeatedly because of issues with landlords or household members, eventually ending up with housing with the assistance of Catholic Charities. Tsutsui stated that Parents would have to remain in the same housing for at least a year for DHS to consider it stable. Tsutsui testified that Parents had only been in the same housing for five months since May 2016.

It was not clearly erroneous for the Family Court to find that Father was not willing and able to provide a safe family home, even with the assistance of a service plan; neither was it clearly erroneous for the court to find that it was not reasonably foreseeable that Father would be willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time, not to exceed two years from the date EG entered foster custody. As discussed above, Father lacked insight into his mental health issues and demonstrated a pattern of not being able to maintain stable housing that was suitable for EG since January 2014 when DHS filed the Petition for Foster Custody. Tsutsui testified that Father was not participating or not consistently participating in services throughout the entire case. Father discontinued couples counseling in November 2014 and denied that there were any problems. Father also discontinued parenting classes in December 2015 after missing five classes. Father was referred for a psychological evaluation five times because of four no-shows. Tsutsui did not believe Father could provide a safe family home because throughout the case Father barely engaged in services, denied having any mental health problems, lacked insight into his mental health needs, and had a pattern of housing instability.

The record is consistent with this testimony.

A key criteria is whether "[i]t is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care[.]" Haw. Rev. Stat. § 587A-33(a)(2). EG's date of entry into foster care is February 20, 2014. Nearly three years later, Father had not addressed his mental health issues and demonstrated a lack of ability to maintain stable housing that was appropriate for EG when the Family Court terminated Father's parental rights on December 23, 2016.

In addition to challenging the various findings of fact, Father challenges COL 6, 9, 10, and 13. To the extent that those conclusions relate to propositions of law, Father has established no error. Rather, Father appears to challenge the underlying FOFs applied in those conclusions. We have already determined, however, that those FOFs, largely replicating those found in FOF 118 and 119, are not clearly erroneous. Therefore, COL 6, 9, 10, and 13 are not wrong.

Therefore, IT IS HEREBY ORDERED that the Order Terminating Parental Rights, filed on December 23, 2016 in the Family Court of the First Circuit is affirmed.

DATED: Honolulu, Hawai'i, September 4, 2018.

On the briefs:

Tae Chin Kim
for Father-Appellant.

Julio Hererra and
Lianne L. Onishi,
Deputy Attorneys General,
for Petitioner-Appellee.

Chief Judge

Associate Judge

Associate Judge